## No. 15,963.

MILOSEVICH *v*. THE PEOPLE
(199 P. [2d] 895)

Decided November 15, 1948.

Messrs. MOYNIHAN-HUGHES-SHERMAN, for plaintiff in error.

Mr. H. LAWRENCE HINKLEY, Attorney General, Mr. DUKE W. DUNBAR, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. CHIEF JUSTICE BURKE delivered the opinion of the court.

PLAINTIFF in error is hereinafter referred to as Paul, and one Mrs. Annie Mattivi as Annie.

Paul was returned guilty of murder of the second degree and sentenced to the penitentiary for a term of 12 to 18 years. Annie was the victim of that homicide. To review the judgment Paul prosecutes this writ and assigns as error: 1. Insufficient evidence; 2. Rulings on admission of evidence; 3. Rulings on instructions. The facts herein stated are either undisputed or established by evidence which the jurors were entitled to credit.

About 3:30 A. M., April 6, 1946, Dr. Hudson of Crested Butte was awakened by a disturbance created by Paul, clearly intoxicated, breaking into his home. Apparently much excited he told the doctor that Annie was sick. The doctor hurried to her residence and found her dead. She lay, scantily clothed, across a bed in an unnatural position and in a badly disordered room. There were cuts and bruises about her face and body. Four ribs and her collarbone were broken, her fingers were lacerated by the forcible removal of rings, there were scratches on her back evidencing a dragging of her body, blood and mucous oozed from her nose and mouth forming a pool on the floor, and under the bed was a

rag saturated with these. She had been dead about an hour. Everything indicated a recent and brutal attack and foreclosed any presumption of death from suicide or natural causes. Instead the circumstances, in the most unmistakable tones, cried "murder," and defendant was taken into custody. The cause of death was determined to be the broken ribs and violent and continued pressure thereon resulting in an accumulation of blood about the heart which stopped its action. On the trial the relations between Paul and Annie and the facts leading up to the tragedy were thus developed. Annie operated a tavern in Crested Butte. There she resided and there Paul, otherwise employed, had lived for some time and more or less irregularly rendered assistance in the operation of the place. In 1941 the two entered into a partnership in that business and Annie executed and delivered to Paul her will, making him her sole beneficiary. In 1942, Paul entered the military service, went overseas, and was finally discharged in November, 1945. He then returned to Crested Butte and the partnership was resumed. About that time Annie told him that one Williams had tried to induce her to change her will but she refused because Paul "was the only one who has helped me and who I can trust." We now move up to April 5, 1946, the day preceding the tragedy. About 3:00 P. M. on that date Paul, with two customers of the tavern, resident in Crested Butte, left that place for Gunnison by automobile. There they patronized various bars and spent money freely. Paul admitted to some thirty drinks during the afternoon and evening. Returning to Crested Butte shortly before 2:00 A. M. one of the men went home. Paul and the other went to the tavern and found the door locked. They aroused Annie who admitted them, whereupon the second man left for home where he arrived about 2:00 A. M. What transpired thereafter until the arrival of the doctor is evidenced only by the facts above recited and the palpably false statements of Paul. The night marshal and coro-

ner were called. To them Paul stated that he returned from Gunnison about 10:30 P. M., retired when the tavern was closed and was called about 2:00 A. M. by Annie who complained that she was sick. When told by the coroner that he would have to take charge of the place Paul answered that it belonged to him under the terms of Annie's will which he then produced. Diamond earrings and finger rings, usually worn by Annie, were found in the pocket of Paul's jacket. Moreover, his bed had not been slept in.

1. The foregoing, corroborated by minor facts not here necessary to recite, overwhelmingly establishes that Annie was the victim of a brutal murder at a time and place and under circumstances leaving no possible conclusion open to the jury save that Paul was the perpetrator.

2. Error is predicated on the court's ruling permitting the district attorney on cross-examination to ask Paul if, as a part of his military instruction, he had taken "what is known as commando training." There are three answers to this assignment: (a) If defendant had taken such training he would have been more skilled in inflicting serious bodily injury or death without the use of a weapon; (b) Paul never gave any direct answer to the question; (c) There was no objection to it, counsel merely saying, "I can not understand what the purpose of it is."

3. Further disposition of the argument on the insufficiency of the evidence and the rulings on instructions may be disposed of in a single paragraph. Objection was made to certain instructions given. We find no fault with those and nothing contained in the argument against them worthy of examination. The instructions tendered and refused are to some extent argumentative, in some so definitely as to almost invade the province of the jury. So far as they are good they are covered by instructions given. This conclusion requires no further comment than that which here follows.

Counsel for Paul stand principally upon the following ruling from the case of *Commonwealth v. Fox,* 7 Gray (Mass.) 585; i. e., "If, therefore, death should ensue from an attack made with the hands and feet only, on a person of mature years, and in full health and strength, the law would not imply malice, because ordinarily death would not be caused by the use of such means." They say that it is a correct statement of the law, adopted by us in *Murphy v. People,* 9 Colo. 435, 13 Pac. 528; and *McAndrews v. People,* 71 Colo. 542, 208 Pac. 486; and clearly applicable in the instant case. Other authorities dealing with the same principle, are cited in the briefs of both counsel. All of these recognize that age and physical condition of the perpetrator and his victim may make this rule wholly inapplicable. We think they nullify it here. Annie was a woman past middle life, afflicted with heart trouble and often sick. All this was known to Paul. He was a strong and vigorous man of the age of 36, thoroughly trained in the military service. Under such circumstances the question of implied malice was, as the court left it, entirely within the province of the jury. This conclusion is supported by the Murphy case, supra, although all comment thereon was probably dictum. Murphy was convicted of voluntary manslaughter and his contention was that the evidence supported the lower grade only. We said, however, that had the verdict been murder it would not have been disturbed, and commented as follows: "The real question is whether the circumstances of the homicide are such as to satisfy the jury that the party charged acted from an unlawful and evil design, with an intent to do grievous bodily harm, and that his acts were of a nature calculated to endanger life. From such acts the law will imply malice."

The McAndrews case is likewise against Paul. It recognizes that bodily assault alone, without the use of any weapon or instrument, may, under such circumstances as here appear, support a verdict of murder, and that

the conclusion is for the jury. The McAndrews judgment was in fact reversed for an instruction which erroneously implied that the fatal blow was delivered on a vital part of the body and that deceased in that case was of "extreme age and debility."

Much of the argument of counsel for Paul raises simply the question of the construction which should be put upon portions of the evidence. For instance, they say that his production of the will and assertion that thereunder he became owner of the place, was intended to evidence the friendly relations existing between him and Annie and the improbability that he would do her an injury. On the contrary the people say that it evidenced the fact that he had in mind the possibility of her changing the will and that in his maudlin condition this supplied a motive for the homicide. What conclusion, if any, should be drawn from the fact was for the jury.

Paul's situation is certainly an unenviable one, but the entire record considered, he is peculiarly fortunate. He was defended in the trial court by able counsel and had a fair trial; the jury might well have found him guilty in the first degree; the kindly jurist who presided was considerate in his sentence. Everything that could be said in his behalf was skillfully presented in this court. The conclusion is inescapable that, prompted by an unjustifiable fear, in his half drunken fury, he slew his best friend.

Finding no reversible error in the record the judgment is affirmed.

Mr. Justice Stone not participating.