The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
March 7, 2019

## 2019COA30

**No. 16CA0750, *People v. Gonzales* — Evidence — Requirement of Authentication or Identification — Audio Recordings**

In a case involving the submission of a voicemail as evidence, the division addresses the standards for authenticating an audio recording under CRE 901 and declines to follow *People v. Baca*, 2015 COA 153, to the extent that it purports to establish an exclusive rule for the authentication of a voice recording.

The division concludes that CRE 901, which governs the authentication of evidence in Colorado courts, requires a flexible, factual inquiry to determine under the facts of each case whether a reasonable jury could determine that the proffered evidence is what its proponent claims. The division states that, in making this determination, the trial court necessarily has broad discretion to consider a variety of factors and circumstances and must consider

all relevant circumstances that bear on whether a recording is what it purports to be.

Applying this analysis, the division concludes that the trial court did not abuse its discretion in admitting the contested voicemail.

The division also concludes that the trial court did not abuse its discretion in admitting a photograph of the defendant's bare torso and arms that showed the defendant's tattoos.

COLORADO COURT OF APPEALS **2019COA30**

Court of Appeals No. 16CA0750
City and County of Denver District Court No. 15CR20002
Honorable Sheila A. Rappaport, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Daniel J. Gonzales,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE BERGER
Tow, J., concurs
Taubman, J., specially concurs

Announced March 7, 2019

Philip J. Weiser, Attorney General, Melissa D. Allen, Assistant Attorney General, Colleen R. Wort, Assistant Attorney General Fellow, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Karen N. Taylor, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     This case addresses the standards for authenticating an audio recording under CRE 901.  Defendant, Daniel J. Gonzales, appeals his convictions for first degree murder with intent and after deliberation, first degree felony murder, abuse of a corpse, stalking, arson, burglary, and aggravated robbery.  He claims that the trial court did not comply with the authentication rules prescribed by a division of this court in *People v. Baca*, 2015 COA 153, when it admitted a voicemail purportedly left by Gonzales for his murder victim.

¶ 2     We reject Gonzales's claim because, to the extent *Baca* purports to establish an exclusive rule for the authentication of a voice recording, we decline to follow it.  We also conclude that when the flexible principles of authentication set forth in CRE 901 are applied, the voicemail was properly authenticated.  Finally, we conclude that the trial court properly admitted a photograph depicting him shirtless, which exhibited two tattoos on his arms. Having rejected all of Gonzales's claims on appeal, we affirm.

I.     Relevant Facts and Procedural History

¶ 3     The evidence admitted at trial, particularly the full confession Gonzales made to the police, established the following facts.

Gonzales grew up down the street from the victim and from a young age was sexually attracted to the victim. When he was about eighteen, Gonzales and a friend broke into the victim's house. The friend stole a TV and a VCR while Gonzales hunted for clues in the house that the victim was gay. Gonzales also stole some of the victim's clothing.

¶ 4 Gonzales eventually moved away from the victim's neighborhood, but his interest in the victim did not disappear. Years later, Gonzales returned to the victim's house, breaking in through the back door. After gaining entry, Gonzales grabbed a large knife from the kitchen and waited a substantial period of time for the victim to return. When he did, Gonzales repeatedly stabbed him in the neck, killing him. Gonzales then sexually assaulted the victim's dead body and attempted, unsuccessfully, to set the house on fire to destroy the evidence. Gonzales fled the scene with a credit card, debit card, and cash that he had taken from the victim's wallet. He was arrested a short time later in Florida.

¶ 5 At trial, the prosecution presented a video recording of Gonzales's confession, as well as other evidence. The jury convicted Gonzales of all charges, the court sentenced him to life in prison

without the possibility of parole plus forty-eight years, and he now appeals.

## II. The Trial Court Did Not Abuse Its Discretion When It Admitted the Voicemail

¶ 6    Gonzales first argues that the trial court erred in admitting a voicemail allegedly left by Gonzales for the victim because the prosecution did not properly authenticate the recording of the voicemail under the test set out in *Baca*, ¶ 30.

¶ 7    We review a trial court's evidentiary rulings for an abuse of discretion. *Davis v. People*, 2013 CO 57, ¶ 13.  A trial court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair, or if its ruling is based on an erroneous view of the law. *People v. Hard*, 2014 COA 132, ¶ 22.

### A. Additional Factual Background

¶ 8    After the police completed their crime scene analysis, the victim's sister went to the house to put the victim's affairs in order. She found a microcassette audiotape along with documents related to an earlier burglary of the victim's house.  On the tape, a man says that he has the victim's pajamas and jeans.  He also says that he is going to return those items to the victim, but not the other

items that were stolen. The sister listened to the tape and, recognizing its value, gave it to the police.

¶ 9    At trial, one of the detectives who had interviewed Gonzales after his arrest testified that he had also watched the video of that interview and had compared Gonzales's voice in the interview to the voice on the tape. The detective testified that the voice on the tape sounded like Gonzales's voice. On that basis, the prosecutor argued that the tape recording had been properly authenticated. Gonzales objected to the admission of the tape recording of the voicemail on authentication grounds, but the trial court overruled the objection.

## B.    Analysis

¶ 10    In *Baca*, a division of this court held that

> [i]f no witness with independent knowledge of the content of the [recording] can verify the accuracy of the recorded conversation, the proponent must instead present a witness who can verify the reliability of the recording process, by establishing the factors laid out in *Alonzi*: the competency of the recorder, the reliability of the recording system, the absence of any tampering with the recording, and the identification of the speakers.

*Baca*, ¶ 30 (citing *Alonzi v. People*, 198 Colo. 160, 163, 597 P.2d 560, 562 (1979)).  In so doing, the division appears to have established an exclusive rule, regardless of the factual circumstances presented, to authenticate an audio recording.[1]

¶ 11    In devising its exclusive test for the authentication of an audio recording, the division relied on the Colorado Supreme Court's *Alonzi* decision (and other authorities) that predated the supreme court's adoption of the Colorado Rules of Evidence.  *Baca, ¶¶* 26-28, 30.

¶ 12    The Attorney General argues that *Baca* was wrongly decided and is inconsistent with the language and underlying purpose of CRE 901.  To the extent that *Baca* holds that the only way an audio

---

[1] In *People in Interest of M.V.*, 2018 COA 163, a different division of this court relied, in part, on *People v. Baca*, 2015 COA 153, to determine whether a video recording was authentic.

recording can be authenticated is to meet one of the two alternatives stated in *Baca*,[2] we agree with the Attorney General.[3]

### 1. CRE 901 Does Not Prescribe Exclusive Tests for the Authentication of Evidence; Instead, CRE 901 Requires Trial Courts to Consider All the Circumstances Surrounding the Evidence

¶ 13    "The burden to authenticate 'is not high — only a prima facie showing is required,' and 'a district court's role is to serve as a gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic.'" *People v. Glover*, 2015 COA 16,

---

[2] Even if *Baca*'s holding is tethered to its specific facts — a jailhouse telephone recording offered by a defendant in a criminal case — it may be too broad.  As the present case well illustrates, there will be innumerable factual situations that are impossible to anticipate in which the *Baca* test may prove too rigid.  We cannot exclude the possibility that there will exist some factual circumstances that would provide sufficient authentication of a jailhouse recording without meeting the requirements of *Baca*.

[3] Our holding creates a division split on this question.  Unless and until the supreme court resolves the division conflict, the district courts may choose which of the conflicting decisions of the court of appeals to follow.  *See* C.A.R. 35(e) ("Opinions designated for official publication must be followed as precedent by all lower court judges in the state of Colorado."); *see also People v. Valdez*, 2014 COA 125, ¶ 27 (stating that when the law is unsettled, in this case because of a split among divisions of the court of appeals, the trial court's alleged error with respect to the law cannot constitute plain error).

¶ 13 (quoting *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014)).

¶ 14     CRE 901, not common law decisions that predate the adoption of the Colorado Rules of Evidence, governs the authentication of evidence in Colorado courts.  *See People v. Ramirez*, 155 P.3d 371, 374-75 (Colo. 2007) (The Colorado Rules of Evidence "govern the admissibility of expert testimony"; prior to the adoption of these rules, "admissibility of expert testimony was governed by common law.").

¶ 15     There is only one rule stated in CRE 901.  "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  CRE 901(a).  The balance of CRE 901 is a series of "illustrations," not black-letter rules.  Subsection (b) explicitly states that the examples given are "[b]y way of illustration only, and not by way of limitation."

¶ 16     Notably, one such illustration states that "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice

at any time under circumstances connecting it with the alleged speaker" is consistent with the authentication requirements in CRE 901(a). CRE 901(b)(5). In our view, this illustration does not establish that a voice recording can always be authenticated by a voice identification alone.[4] But this illustration, along with the others included in CRE 901(b), does demonstrate that the relevant considerations in authenticating a voice recording are not limited to those set out in *Baca.*

¶ 17    The *Baca* division relied heavily on a decision by the Colorado Supreme Court that predated the adoption of the Colorado Rules of Evidence. *Baca*, ¶¶ 26-27, 29 (citing *Alonzi*, 198 Colo. at 163, 597 P.2d at 562). *Alonzi*, in turn, "note[d] with approval the test set out in *United States v. Biggins*, 551 F.2d 64 (5th Cir. 1977)," which is similar to the test established in *Baca.* 198 Colo. at 163, 597 P.2d at 562. But, in a portion of *Biggins* not quoted by the supreme court in *Alonzi* (and not noted by the *Baca* division), the Fifth Circuit also stated, "[i]f the trial judge independently determines

---

[4] As we read *Baca,* for purposes of its first alternate authentication method, the identification of a voice alone is insufficient to authenticate a recording.

that the recording accurately reproduces the auditory evidence, however, his discretion to admit the evidence is not to be sacrificed to a formalistic adherence to the standard we establish." 551 F.2d at 67.

¶ 18 Moreover, there is a real question whether the portion of *Alonzi* relied on by the *Baca* division was dictum. As stated by the supreme court, the precise question presented in *Alonzi* was whether the proponent of an audio recording was required to prove a chain of custody. *Alonzi,* 198 Colo. at 163, 597 P.2d at 562. The supreme court held that a chain of custody was not always required. *Id.* Having definitively answered the question raised by the appellant, the court nevertheless addressed other matters not necessary to its decision. *Id.*

¶ 19 Even if the supreme court's statements in *Alonzi* regarding the required methods to authenticate an electronic recording constitute a holding of the court, and not dictum, the source of authority for both *Alonzi* and the Colorado Rules of Evidence is the same — the Colorado Supreme Court. *See* Colo. Const. art. VI, § 21; *Forma Sci., Inc. v. BioSera, Inc.,* 960 P.2d 108, 116 (Colo. 1998) ("The Colorado Rules of Evidence were adopted under this court's rule-making

9

powers articulated in the Colorado Constitution."). When the Colorado Supreme Court exercises its constitutional authority and adopts a rule of procedure or evidence that conflicts with an earlier opinion of that court, the later precedent or rule controls, not the former. *See Ramirez*, 155 P.3d at 374-75.

¶ 20 Neither the language of CRE 901 nor its underlying purpose supports the prescription of two exclusive methods to authenticate a voice recording. As noted above, CRE 901 does not set forth any categorical or exclusive rules. To the contrary, the very structure of CRE 901 eschews such categorical rules. As a division of this court stated in *Glover*, ¶ 25 (quoting *Tienda v. State*, 358 S.W.3d 633, 639 (Tex. Crim. App. 2012)), in the context of authenticating records from Facebook or another social networking website, "jurisdictions across the country have recognized that electronic evidence may be authenticated in a number of different ways consistent with Federal Rule 901 and its various state analogs."

¶ 21 We agree that CRE 901 contemplates a flexible, factual inquiry to determine under the facts of each case whether a reasonable jury could determine that the proffered evidence "is what its proponent claims." *Glover*, ¶ 12. In making this determination, the trial court

necessarily has broad discretion to consider a variety of factors and circumstances.

¶ 22    In some cases, under some circumstances, particularly when there is a colorable claim that a recording has been altered, the factors discussed in *Baca* may be highly pertinent to the authenticity determination.  In other cases, the factors identified by *Baca* may be inapplicable or unnecessary.

¶ 23    The deficiencies of such a categorical rule are illustrated by the facts in *State v. Smith*, 540 P.2d 424 (Wash. 1975).  In that murder case, the victim took the precaution of carrying a tape recorder with him while keeping an appointment with the murderer. *Id.* at 426.  During the victim's autopsy, the authorities found the tape recording.  *Id.*  Despite the fact that the recording did not satisfy categorical common law rules for authentication similar to those adopted in *Baca*, the Washington Supreme Court held that the recording was admissible on the basis of scientific testimony and other evidence corroborating its accuracy and completeness. *Id.* at 429.

¶ 24    Or, take the hypothetical situation where a serial killer keeps an oral diary of his activities.  After the killer's arrest, the police find

the oral diary in his residence. No recording equipment is found in the house. A police detective who has interviewed the killer testifies that the voice on the tape is that of the defendant. As we read *Baca*, the diary would be inadmissible even though, under the circumstances, the recording would be highly probative and reliable evidence of the crimes.

¶ 25    Other courts, applying their versions of Fed. R. Evid. 901, have rejected the common law standards typified by *Alonzi, Biggins*, and *Baca* in favor of a more flexible approach.[5] For example, the Michigan Supreme Court concluded that Michigan's adoption of Fed. R. Evid. 901 abrogated the more specific common law reliability of recording process factors, in favor of a more flexible approach. *People v. Berkey*, 467 N.W.2d 6, 10-12 (Mich. 1991); *see also Angleton v. State*, 971 S.W.2d 65, 68-69 (Tex. Crim. App. 1998) (en banc) (same, applying Texas equivalent of CRE 901); *State v.*

---

[5] When the Colorado Supreme Court adopted the Colorado Rules of Evidence, CRE 901 was substantively identical to Fed. R. Evid. 901. Thus, interpretations of Fed. R. Evid. 901 are highly persuasive in our interpretation of CRE 901. *See People v. Short*, 2018 COA 47, ¶ 41. In 2011, many of the Federal Rules of Evidence were rewritten in more contemporary language, but no substantive changes were intended. Fed. R. Evid. 901 advisory committee's note to 2011 amendments.

*Jackson*, 54 P.3d 739, 742-43 (Wash. Ct. App. 2002) (acknowledging reliability of recording process factors but holding that those factors are not the exclusive determinants of authenticity).

¶ 26    As the Eighth Circuit has observed, "[p]rivate use of recording equipment has become widespread," and therefore specific factors relating to the reliability of the recording process "should be applied in a practical light to assure the reliability of the recorded material," rather than in a "mechanical or wooden" manner.  *United States v. O'Connell*, 841 F.2d 1408, 1420 (8th Cir. 1988).  The same court noted that recordings discovered by the police should not "be subject to the same requirements [that courts] apply when a government agent or informant initiates a conversation knowing that it is to be recorded."  *Id.*; *see also Angleton*, 971 S.W.2d at 68 ("[T]he government does not have to prove when, where, how, and by whom tape recordings were made, when those recordings were recovered from the defendant or an alleged co-defendant, were not created as a result of government involvement, were not tampered with, and the defendant is identified as a speaker on the tape.").

¶ 27    Similarly, authoritative treatises addressing Fed. R. Evid. 901 have recognized that the rule establishes flexible procedures for determining the authenticity of an electronic recording. *See, e.g.*, 8 Michael H. Graham, *Handbook of Federal Evidence* § 901:5, Westlaw (8th ed. database updated Nov. 2018) ("The specific requirements for authentication of sound recordings vary depending upon the circumstances."); 5 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 9:14, Westlaw (4th ed. database updated July 2018) ("[M]ost courts refuse to be pinned down to the [common law] approach and favor greater flexibility in assessing authenticity of recorded evidence."); 31 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure* § 7110, Westlaw (1st ed. database updated Nov. 2018) ("[I]n the case of telephone communications the trier of fact undoubtedly is familiar with the device and well aware of the potential for problems, thus alleviating the need for a detailed foundation.").[6]

---

[6] 2 Kenneth S. Broun, *McCormick on Evidence* § 216 n.29, Westlaw (7th ed. database updated June 2016), describes strict rules similar to the ones adopted in *Baca*, but then refers to *People v. Sangster*, 8 N.E.3d 1116 (Ill. App. Ct. 2014) "[f]or an example of a more relaxed foundation." *McCormick* then contrasts the approach in *Sangster* with the approach in *People v. Baca*, 2015 COA 153.

¶ 28    The *Alonzi* court was legitimately concerned about falsification of electronic recordings.  *See Alonzi,* 198 Colo. at 163-64, 597 P.2d at 562.  There is no question that the alteration of electronic recordings, whether audio or video, is more of a risk today than when *Alonzi* was decided in 1979.  *See* Bruce E. Koenig & Douglas S. Lacey, *Forensic Authentication of Digital Audio and Video Files, in* Handbook of Digital Forensics of Multimedia Data and Devices 133 (Anthony T. S. Ho & Shujun Li eds., 2015).

¶ 29    Developments in computer technology and software enable almost any owner of a personal computer with the necessary knowledge and software to falsely edit recordings.  *Id.*  But, the fact that the falsification of electronic recordings is always possible does not, in our view, justify restrictive rules of authentication that must be applied in every case when there is no colorable claim of alteration.  *See People v. Sangster,* 8 N.E.3d 1116, 1127 (Ill. App. Ct. 2014) ("[N]either at trial nor before [the appellate court] did Sangster make a colorable claim that the recording was other than authentic or accurate.").

¶ 30     Thus, the trial court must consider all relevant circumstances that bear on whether a recording is what it purports to be.[7]  When a plausible claim of falsification is made by a party opposing the introduction of a recording, the court may and usually should apply additional scrutiny (including, when appropriate, the *Baca* factors) to make the preliminary determination entrusted to the trial court:  Could a reasonable jury determine that the thing offered into evidence is what it purports to be?

### 2.     Application

¶ 31     Applying this flexible approach of CRE 901 to the voicemail in this case, we conclude that the trial court properly made a preliminary finding that it was what it purported to be.  There was no claim by Gonzales that the recording was falsified or manipulated in any way.  The recording was found in the decedent's house by his sister after the premises were released to her by the police.  A police officer who interrogated Gonzales at length testified that Gonzales's voice was heard on the voicemail.  These uncontested facts were sufficient to support a CRE 901 finding that

---

[7] CRE 104 provides that in making preliminary determinations such as authenticity, the court is not bound by the rules of evidence.

16

the voicemail was what the prosecutor purported it to be — a voicemail left by Gonzales for the victim. The ultimate determinations of whether the voicemail was authentic and the weight, if any, to be given to it were exclusively for the jury to determine. *See People in Interest of A.C.E-D.*, 2018 COA 157, ¶ 43; *Glover*, ¶ 13.

¶ 32　Accordingly, the trial court did not abuse its discretion in admitting the voicemail.

### III.　The Trial Court Correctly Admitted the Photograph of Gonzales's Tattoos

¶ 33　In his only other contention of error, Gonzales argues that the trial court abused its discretion in admitting a photograph showing Gonzales's tattoos because it was both irrelevant and highly prejudicial. We disagree on both fronts.

¶ 34　All relevant evidence is admissible unless prohibited by constitution, statute, or court rule. CRE 402; *Kaufman v. People*, 202 P.3d 542, 552 (Colo. 2009). Evidence is relevant if it makes the existence of any fact of consequence more or less probable. CRE 401. But, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice."

17

CRE 403. Evidence is unfairly prejudicial if it has "some undue tendency to suggest a decision on an improper basis, commonly an emotional basis, such as bias, sympathy, hatred, contempt, retribution, or horror." *People v. Cardenas*, 2014 COA 35, ¶ 52 (quoting *People v. Fasy*, 813 P.2d 797, 800 (Colo. App. 1991)).

¶ 35　　The photograph at issue shows Gonzales shirtless with two tattoos on his inner forearms clearly visible. The tattoo on one arm says "CHUBBY," and the tattoo on the other says "CHASER." No other tattoos are visible in the photograph.

¶ 36　　"Evidence of a defendant's tattoos may be relevant to that defendant's intent and motive." *Id.* at ¶ 51. The photograph was relevant to prove Gonzales's motive. Gonzales said during his police interview that he was attracted to heavyset men. The photograph corroborates that statement and supports the prosecution's theory that Gonzales targeted the victim because his body type was consistent with Gonzales's preferred body type.

¶ 37　　Gonzales argues that the photograph was highly prejudicial because from it the jury could have inferred that Gonzales chased chubby men with the intention of doing them harm, rather than because he was sexually attracted to them. But once relevance is

established, the inferences drawn from that evidence are solely for the jury to draw, not an appellate court. *See People v. Summit*, 132 P.3d 320, 324 (Colo. 2006). Under CRE 403, an appellate court assumes the maximum probative value of relevant evidence and the minimum prejudicial value. *People v. Gibbens*, 905 P.2d 604, 607 (Colo. 1995). Applying that rule here, the trial court acted well within its discretion in admitting the photograph. Gonzales admitted both that he was he was attracted to larger men and that he killed a person who fit that physical description. On these facts, the jury was entitled to consider the probative value of the tattoos.[8]

## IV. Conclusion

¶ 38    The judgment of conviction is affirmed.

JUDGE TOW concurs.

JUDGE TAUBMAN specially concurs.

---

[8] Gonzales also claims that it was unnecessary for the jury to see his bare torso. But Gonzales does not explain, and we cannot discern, how the image of his bare torso might incite such "bias, sympathy, hatred, contempt, retribution, or horror" that it would render the admission of this evidence improper or prejudicial. *People v. Cardenas*, 2014 COA 35, ¶ 52 (quoting *People v. Fasy*, 813 P.2d 797, 800 (Colo. App. 1991)).

JUDGE TAUBMAN, specially concurring.

¶ 39     Although the majority declines to follow *People v. Baca*, 2015 COA 153, 378 P.3d 780, "to the extent *Baca* purports to establish an exclusive rule for the authentication of a voice recording," I do not share that interpretation.  *Supra* ¶ 2.  As a member of the *Baca* division, I agreed with its analysis, and I still do.  I also agree with much of the majority's analysis in this case and its conclusion that the microcassette recording that appeared to have the voice of defendant, Daniel J. Gonzales, was properly admitted.

¶ 40     While some language in *Baca* suggests that the division intended to establish an exclusive rule for the authentication of voice recordings, the *Baca* division acknowledged that CRE 901(a) sets forth a broad standard for the authentication of evidence, including voice recordings.  In *Baca,* the division held that to authenticate a voice recording, a witness had to show independent knowledge of the content of a telephone call or an ability to verify the accuracy of the recording process.  That test was especially appropriate under the facts in that case, which involved the admissibility of a telephone conversation between a jail inmate and his mother.  In those circumstances, undoubtedly, many inmates

made telephone calls, thereby making it necessary to ensure the identity of the callers to authenticate the phone conversation.

¶ 41     Here, in contrast, the court was concerned with the admissibility of a microcassette recording found by the victim's sister in the victim's home.  In that situation, there was a reduced likelihood of improper authentication of Gonzales's voice.

¶ 42     Accordingly, because I agree that the results in both *Baca* and this case were correct, I specially concur.